# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRINA E. REDDISH, <br><br>       *Plaintiff*, <br><br>   v. <br><br> WASHINGTON METRO AREA TRANSIT AUTHORITY, <br><br>       *Defendant.* | Civil Action No. 22-2658 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Trina E. Reddish brings this action against her former employer, the Washington Metropolitan Area Transit Authority ("WMATA"), alleging discrimination and retaliation under the Rehabilitation Act, 29 U.S.C. § 794(a), and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* The parties have completed discovery, and WMATA now moves for summary judgment on all claims. Among other things, WMATA argues that Reddish's claims under the Rehabilitation Act fail because she could not perform the essential functions of her job; her claim for hostile work environment sex discrimination is time-barred; and no reasonable jury could find that her termination was retaliatory or motivated by sex discrimination. *See generally* Dkt. 38-1.

For the reasons that follow, the Court will **GRANT** in part and **DENY** in part WMATA's motion.

# I. BACKGROUND

## A.    Factual Background

For purposes of resolving the motion for summary judgment, the Court takes "the facts in the record and all reasonable inferences derived therefrom in a light most favorable" to the non-moving party. *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (citation modified).

Reddish began working for WMATA as an "Equipment Operator D" around February 2013. Dkt. 40-1 at 1 (Pl.'s Resp. to Def.'s SUMF ¶ 1); Dkt. 39-4 at 41 (Reddish Dep. 60:11–21). According to WMATA's official job description, an Equipment Operator D must perform "repair work utilizing on and off track heavy equipment," Dkt. 38-5 at 2, and must possess the "[a]bility to perform strenuous physical tasks including frequent lifting of object[s] weighing up to 50 pounds and occasionally to 100 pounds," *id.* at 9. Shortly after Reddish started work as an Equipment Operator D, she "began filing complaints against coworkers and supervisors [alleging] that she had been subjected to discrimination based on her sex." Dkt. 16 at 2 (Am. Compl. ¶ 11). Among other things, Reddish reported that her coworkers refused to ride in WMATA vehicles with her; that a supervisor directed WMATA staff to stay away from her; that she was told that she could not work at the WMATA Greenbelt Yard because there were no female lockers available, even though several lockers at the facility were vacant; that she was called "Jezebel" by male coworkers; and that a colleague told her that this treatment was her fault because she "chose to work in a male dominant environment." *Id.* at 7–9 (Am. Compl. ¶¶ 52–61); Dkt. 39-2 at 22–23; *see also* Dkt. 39-4 at 45 (Reddish Dep. 117–120).

In August 2013, Reddish sustained a shoulder injury on the job which required her to spend time performing light duty, such as driving WMATA work trucks, while she awaited surgery. Dkt. 39-4 at 40 (Reddish Dep. 53:1–55:3). Following that surgery, Reddish returned to full duty. *Id.* (Reddish Dep. 55:14–57:5). Then, in February 2015, WMATA transferred

Reddish from working in WMATA yards and assigned her to "work in an office to assist with the completion of documentation and compiling reports and to assist individuals in higher job levels with their documentation."  Dkt. 40-1 at 3 (Def.'s SUMF ¶ 5, Pl.'s Resp. to Def.'s SUMF ¶ 5).  During the period that Reddish served in an administrative capacity, her formal WMATA job title did not change, she was at least occasionally asked to return to the field to operate equipment, and she continued to maintain certifications associated with the Equipment Operator D position.  Dkt. 39-4 at 41, 45 (Reddish Dep. 57:21–59:9, 120:16–21).

The parties disagree as to why Reddish was transferred to this in-office administrative role.  WMATA maintains that she was assigned at the direction of WMATA superintendent Nicholas Lamb, who had been told by his supervisor that they "need[ed] someone that is articulate and able to perform the duties of making sure that all of our paperwork matches up with the day-to-day activities that we perform."  Dkt. 41-3 at 2–3 (Lamb. Dep. 61:17–62:2); *see also* Dkt. 41-1 at 1 (Def.'s Supp. SUMF ¶ 26).  Reddish, in contrast, testified that she was "removed from [her] field office" because she had "fil[ed] numerous reports and complaints to management."  Dkt. 39-4 at 40 (Reddish Dep. 56:6–19).  Neither party, however, claims that her assignment to administrative duties was in any way attributable to, or an accommodation for, her shoulder injury or any other physical disability.  Dkt. 40-1 at 3 (Def.'s SUMF ¶ 5, Pl.'s Resp. to Def.'s SUMF ¶ 5).  Reddish attests that, at the time of her reassignment, she "had no restrictions on [her] ability to perform [her] job description as a[n] Equipment Operator D."  Dkt. 39-4 at 41 (Reddish Dep. 57:6–11).  That is, in February 2015, she could perform all of the duties of an Equipment Operator D, *id.* at 40–41 (Reddish Dep. 56:22–57:5), "without any accommodations," *id.* at 42 (Reddish Dep. 61:10–18).

By August 2015, Reddish's health worsened.  She experienced chronic debilitating back pain, degenerative disc disease, lumbar disc disease, and other conditions, which required injections to treat.  Dkt. 40-1 at 3 (Def.'s SUMF ¶ 8); Dkt. 39-4 at 41–42 (Reddish Dep. 57:12–62:9).  In June 2017, Reddish's physician recommended that she use an ergonomic chair at work. Dkt. 40-1 at 4 (Def.'s SUMF ¶ 10).  In July 2017, Reddish forwarded her prescription for an ergonomic chair to department supervisors.  *Id.* (Def.'s SUMF ¶ 11, Pl.'s Resp. to Def.'s SUMF ¶ 11).  Reddish then sent the request to the WMATA Americans with Disabilities Act ("ADA") compliance manager in August 2017, and WMATA evaluated her for an ergonomic chair later that month.  *Id.* at 4–5 (Def.'s SUMF ¶¶ 12–13, Pl.'s Resp. to Def.'s SUMF ¶¶ 12–13). Reddish's immediate need for the ergonomic chair was superseded, however, when she went out on medical leave to have back surgery on August 31, 2017.  *Id.* at 5 (Pl.'s Resp. to Def.'s SUMF ¶ 14).  Nonetheless, after she went out on leave, Reddish was informed that, following an ergonomic assessment, WMATA's Office of Equal Employment Opportunity granted her request and concluded that Reddish's "department should requisition the purchase of" an ergonomic chair and document holder for her use.  Dkt. 39-4 at 207–08.

While Reddish was on medical leave, Dr. Carl Johnson, a physician employed by the WMATA Office of Health and Wellness, determined that she was medically disqualified from working as an Equipment Operator D, and he made his determination retroactively effective to September 1, 2017.  Dkt. 40-1 at 5. (Def.'s SUMF ¶ 15).  In a February 27, 2018, letter from Dr. Johnson informing her of her medical disqualification, Reddish was also informed that she had been referred to WMATA human resources to be placed in the "Section 124/16L program," which allowed her to seek potential reassignment to a different position as an accommodation under the ADA.  Dkt. 38-11 at 2; *see also* Dkt. 38-13 at 2.  In a subsequent March 2018 letter,

WMATA Human Resources Specialist LaShawn Lott informed Reddish that, if she submitted her resume to the ADA Program Compliance Manager, the WMATA ADA panel would review internal job postings for the following 60 days to identify potential positions for her assignment. Dkt. 38-13 at 2.  That letter also stated that, under the terms of her collective bargaining agreement, Reddish was eligible to remain in the program and to work with Ms. Lott to seek other WMATA employment until September 1, 2020—three years from the date of her medical disqualification.  *Id.* at 2–3.  Reddish retained the option to return to her Equipment Operator D position, moreover, if she became physically qualified to do so during that three-year period.  *Id.* at 3.

Two months later, in May 2018, WMATA informed Reddish that the Office of Equal Employment Opportunity had been unable to find a vacant position for which she was qualified, despite "searching for over 60 days," and that it had concluded its search for a reassignment. Dkt. 38–14 at 2.  WMATA reminded Reddish, however, that she remained free to "continue to seek job placement assistance from LaShawn Lott, the Section 124/16L Program Administrator." *Id.*  WMATA asserts that Reddish never applied for any WMATA jobs following receipt of the May 2018 letter.  Dkt. 40-1 at 7 (Def.'s SUMF ¶ 23).  Reddish denies this, but she does not identify any job for which she applied and, instead, merely asserts that she "provided her resume [presumably to Ms. Lott] to be used to apply for vacant positions."  *Id.* (Pl.'s Resp. to Def.'s SUMF ¶ 23).  She objects that "WMATA only submitted her application a single time" through the reassignment program, *id.*, referencing an email thread discussing Reddish as a qualified candidate for an Administrative Assistant I position, Dkt. 39-4 at 214–17.  Reddish was flagged for that position by an ADA Reassignment official at WMATA, *id.* at 186, but was not ultimately selected.

In July 2020, while she was still on leave, Reddish received a further letter from WMATA. This letter informed Reddish that WMATA intended to terminate her employment on September 1, 2020, unless she was "[]able to establish [her] ability to return to duty." Dkt. 38-12 at 2. As indicated, WMATA terminated her employment on that date. Dkt. 40-1 at 7 (Def.'s SUMF ¶ 24).

**B.      Procedural History**

On February 26, 2021, Reddish filed an initial inquiry questionnaire with the Equal Employment Opportunity Commission ("EEOC") reporting several adverse actions, including her 2015 "retaliatory move[] to an office position" and her eventual discriminatory termination. Dkt. 13-2 at 1–4. Plaintiff filed an EEOC charge on May 4, 2021, and filed an amended charge on July 21, 2021. Dkt. 13 at 3 (Pl.'s Resp. to Def.'s SUMF ¶¶ 2–3). She then filed this suit against WMATA in September 2022, asserting claims for disability discrimination under the ADA, sex discrimination, and retaliation. *See* Dkt. 1 at 3–5 (Compl. ¶¶ 28–49).

WMATA moved to dismiss the original complaint or, in the alternative, for summary judgment. *See* Dkt. 10. In its motion, WMATA argued that Reddish's ADA claim was barred by sovereign immunity, because WMATA is an interstate compact, and that she had failed to exhaust her administrative remedies, because her May 4, 2021, EEOC charge was not filed within 180 days of her termination. *See generally* Dkt. 10-1. Following briefing, the Court issued a Memorandum Opinion and Order granting WMATA's motion in part and denying it in part. *See* Dkt. 15. As to the ADA claim, the Court agreed that WMATA enjoyed sovereign immunity, *id.* at 5–6, but the Court granted Reddish leave to amend her complaint to allege the equivalent disability discrimination claim under the Rehabilitation Act, *id.* at 13. As to Reddish's obligation to exhaust her administrative remedies, the Court explained that, under D.C. Circuit precedent, the filing of an EEOC intake questionnaire can sometimes "qualify as a

'charge' under Title VII" for the purpose of administrative exhaustion.  *Id.* at 10 (citing *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 528 (D.C. Cir. 2019)).  Because WMATA had not shown otherwise, the Court assumed that Reddish's intake questionnaire so qualified.  *Id.* at 10–11.

The Court went on to note, however, that Reddish's February 26, 2021, intake questionnaire, even if timely as to her termination, seemed to have come too late to preserve Reddish's claims relating to the earlier acts of alleged discrimination.  *Id.* at 12–13.  But because the Court was already permitting Reddish to amend her complaint to add the Rehabilitation Act claim, it also permitted her "to clarify which acts of alleged discrimination form the basis for [her claim], when those acts occurred, and whether she has some theory of relief that would permit any acts that occurred more than 180 days before she filed her EEOC initial questionnaire to form the basis of a claim."  *Id.* at 13.

Reddish filed her amended (and now operative) complaint in October 2023, *see* Dkt. 16 (Am. Compl.), asserting three claims against WMATA.  First, she claims that WMATA failed to provide her reasonable accommodations for her disability, failed to engage in the interactive process, and ultimately terminated her because of her disability in violation of the Rehabilitation Act.  *Id.* at 4 (Am. Compl. ¶¶ 29–39).  Second, she claims that WMATA discriminated against her on the basis of sex because male employees received reasonable accommodations and assistance finding other positions, but she was simply terminated after WMATA determined that she was medically disqualified from her job.  *Id.* at 4–6 (Am. Compl. ¶¶ 40–50).  In that claim, Reddish also invokes several alleged (mostly undated) incidents of discriminatory treatment during her employment, and she avers that "she experienced discrimination based on her sex on a regular and continuous basis" over the course of her entire tenure at WMATA.  *Id.* at 7–9 (Am.

Compl. ¶¶ 52–62).  Finally, Reddish claims that she was terminated in retaliation for requesting reasonable accommodations and for her prior complaints of sex discrimination.  *Id.* at 9 (Am. Compl. ¶¶ 64–68).

After WMATA answered the amended complaint, *see* Dkt. 17, the parties engaged in discovery and then attempted to resolve their dispute in mediation, *see* Min. Entry (Oct. 2, 2024). When mediation failed, *see* Dkt. 36, WMATA moved for summary judgment on all claims, *see* Dkt. 38.  That motion is now before the Court.

## II.  LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In considering a motion for summary judgment, the Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving party.  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The non-moving party's opposition must consist of more than mere allegations or denials; instead, it must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The moving party is entitled to judgment as a matter of law if the non-moving party fails to make a showing sufficient to establish the

existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022) (citation modified). If the non-moving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

### III.  ANALYSIS

**A.    Rehabilitation Act**

        1.    *Termination*

The Court begins with Reddish's claim that WMATA terminated her on the basis of her disability in violation of the Rehabilitation Act. The Rehabilitation Act makes it unlawful to exclude a "qualified individual with a disability[,] solely by reason of her . . . disability," from any "program or activity receiving Federal financial assistance" or to "subject[] [such an individual] to discrimination under any [such] program or activity." 29 U.S.C. § 794(a). To give further content to these prohibitions, the Rehabilitation Act directs courts to apply the same "standards" that apply under the ADA, 42 U.S.C. § 12101 *et seq. See Menoken v. Dhillon*, 975 F.3d 1, 4 (D.C. Cir. 2020) (citing 29 U.S.C. § 794(d)). To establish a violation of the Rehabilitation Act, Reddish bears the burden of proving that (1) she was "disabled within the meaning of the Rehabilitation Act;" (2) that she was "otherwise qualified;" (3) that she was "excluded from, denied the benefit of, or subject to discrimination under a program or activity;" and (4) that "the program or activity [was] carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008).

WMATA's motion for summary judgment focuses on the second of these elements and posits that no reasonable jury could find that Reddish was "otherwise qualified" for the position she held. The ADA (and thus, by reference, the Rehabilitation Act) defines a qualified individual as "an individual who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such individual holds or desires."  42 U.S.C.

§ 12111(8); *see Butler v. WMATA*, 275 F. Supp. 3d 70, 80–81 (D.D.C. 2017).  According to

WMATA, Reddish does not meet that description because her disabilities prevented her from

lifting heavy weights, operating equipment, and otherwise performing the essential functions of

an Equipment Operator D, even with reasonable accommodations.  Dkt. 38-1 at 5–7.  Reddish,

for her part, does not contend that she was able to perform the functions highlighted by WMATA

but, instead, argues that she was able to perform the essential functions of what was her "current

role" at the relevant time, which required her to perform administrative tasks in the office.  Dkt.

39-2 at 10.

"Generally, the question of what constitutes an essential function of a job is a factual

issue to be determined by a jury."  *Hancock v. Washington Hosp. Ctr.*, 13 F. Supp. 3d 1, 5

(D.D.C. 2014) ("*Hancock II*").  In determining the essential functions of a position, courts may

consider evidence such as "the employer's judgment, written job descriptions, and time spent

performing the function," *Butler*, 275 F. Supp. 3d at 81; *see also* 29 C.F.R. § 1630.2(n)(3), and

"[e]mployers enjoy substantial deference in defining essential functions," *Floyd v. Lee*, 85 F.

Supp. 3d 482, 510 (D.D.C. 2015).

Reddish maintains that, following her transfer to administrative duties, she worked as an

"Acting Support Supervisor" for WMATA.  Dkt. 39-2 at 10; Dkt. 40-1 at 8 (Pl.'s SUMF ¶ 1).

The record offers little support for her contention that her official job title ever changed or that

WMATA ever established or formally recognized the position of "Acting Support Supervisor."

The only record materials that Reddish identifies that refer to that position or that give her that

title are copies of Reddish's own resume, although WMATA occasionally used the resume

internally in attempting to find her a new position following her medical disqualification.  Dkt.

40-1 at 8 (Pl.'s SUMF ¶ 1); Dkt. 39-4 at 116–21, 186, 188–92.  At her deposition, moreover, Reddish conceded that, even after she moved to the administrative position, she "was still an equipment operator" and that her "title never changed."  Dkt. 39-4 at 41 (Reddish Dep. 59:7–8).

Whatever her official job title was, however, it is uncontested that for more than two years (before she took her medical leave) Reddish's primary duties, *see id.* (Reddish Dep. 58:4–15) (Reddish discussing how, on one occasion, she "was snatched from the office and made to go in the field to operate"), required that she perform administrative tasks in a WMATA office, Dkt. 40-1 at 3 (Def.'s SUMF ¶¶ 5–7, Pl.'s Resp. to Def.'s SUMF ¶¶ 5–7).  WMATA does not maintain that Reddish was unable to perform those administrative functions at the time of her termination.  Instead, it argues that this multiyear assignment was only temporary and did not alter Reddish's essential duties as an Equipment Operator.  *See* Dkt. 40-1 at 2 (Def.'s SUMF ¶ 6).

WMATA's argument might well prevail at trial.  But that is not the question for present purposes.  Instead, the Court must decide whether the evidence is sufficient to permit a reasonable jury to find that, despite Reddish's job title, she had, in fact, transitioned to a new position.  Although a close question, the Court is persuaded that Reddish has proffered enough (albeit barely enough) evidence to avoid summary judgment.

To be sure, the Rehabilitation Act "does not require an employer to reallocate job duties [and] to change the essential functions of a job" as an accommodation for a disabled employee.  *Hancock v. Washington Hosp. Ctr.*, 908 F. Supp. 2d 18, 24 (D.D.C. 2012) ("*Hancock I*") (citation modified).  And even if an employer does "voluntarily accommodate[] an employee's disability by temporarily eliminating an essential function" of her job, doing so "does not mean that the employer has irrevocably waived the essential function of the job."  *Hancock II*, 13 F.

Supp. 3d at 6 ("[A]n employee who cannot perform an essential function is not a qualified individual under the ADA, even if the employer previously chose to accommodate the employee by excusing the employee from performing the essential function."). WMATA might, therefore, be entitled to summary judgement if the only conclusion that a reasonable jury could draw from the evidence was that the office position was always considered transitory or that it constituted a temporary accommodation.

All agree, however, that the administrative role was not created to accommodate Reddish's disability. Indeed, by WMATA's own account, it reassigned Reddish to administrative work for its own business reasons before her medical disqualification. Dkt. 40-1 at 3 (Def.'s SUMF ¶ 5). The position, moreover, existed for an extended period of time—two-and-a-half-years—and ended (if at all) only after Reddish took medical leave to have back surgery at the end of August 2017. *Id.* at 5 (Def.'s SUMF ¶ 14, Pl.'s Resp. to Def.'s SUMF ¶ 14). During this period, Reddish mostly performed administrative duties and only occasionally had to operate machinery or to lift heavy loads. In these unique circumstances, the Court is persuaded that a reasonable jury could find that operating heavy equipment and lifting heavy items—unlike assisting with paperwork—were not essential functions of her actual job. *See* 29 C.F.R. § 1630.2(n)(3)(iii) ("Evidence of whether a particular function is essential includes, but is not limited to . . . [t]he amount of time spent on the job performing the function."). And it follows that a reasonable jury could also find that Reddish was able to perform the essential functions of her employment, despite her disability.

The Court will, accordingly, deny WMATA's motion for summary judgment with respect to Reddish's Rehabilitation Act termination claim.

2.    *Reasonable Accommodation*

Reddish raises two reasonable accommodation challenges.  As to both claims, WMATA is entitled to summary judgment.

**a.**

Reddish first argues that WMATA denied her a reasonable accommodation by failing to provide her with an ergonomic chair.  WMATA disagrees on two grounds.  It first argues that the ergonomic chair was not a reasonable accommodation because it would not have allowed Reddish to perform the essential functions of her job as an Equipment Operator D.  Dkt. 38-1 at 6–7.  The Court rejects that argument for the reasons discussed above; to the extent a reasonable jury might find that Reddish's *de facto* job had shifted to an administrative role, the jury might also find that the ergonomic chair constituted a reasonable accommodation for her disability.  WMATA's second argument posits that it never actually denied Reddish's request.  To the contrary, it "was engaging in the interactive process" at the time Reddish took her medical leave, *id.* at 6 n.2, and it eventually approved the request.  In response, Reddish asserts that WMATA "never ordered the chair and [has] never provided any legitimate reason for this denial."  Dkt. 39-2 at 13.  On this score, WMATA has the better of the arguments.

The EEOC regulations governing reasonable accommodations "contemplate[] a flexible give-and-take between employer and employee so that together they can determine what accommodation would enable the employee to continue working."  *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (citation modified).  To prove that she was denied a reasonable accommodation, Reddish "must show either that [WMATA] in fact ended the interactive process or that it participated in the process in bad faith."  *Id.*  Reddish has failed to identify evidence from which a reasonable jury could find that WMATA violated the statute in either respect.  She admits that WMATA evaluated her for an ergonomic chair less than two weeks after she made

her request to the WMATA ADA Compliance Manager in August 2017.  Dkt. 40-1 at 4–5 (Def.'s SUMF ¶¶ 12–13, Pl.'s Resp. to Def.'s SUMF ¶¶ 12–13).  And while Reddish began her medical leave almost immediately following her evaluation, *id.* at 5 (Def.'s SUMF ¶ 14, Pl.'s Resp. to Def.'s SUMF ¶ 14), WMATA wrote to her a few weeks after her leave began, indicating that it had decided to procure a chair and a document holder to accommodate her disability, Dkt. 39-4 at 207–08.  WMATA also informed Reddish that "if [she] need[ed] further assistance after this accommodation has been provided, [WMATA] will work with [her] . . . to identify accommodation options."  *Id.*

At most, then, Reddish can show that there was a brief delay between her original request to her supervisors for an ergonomic chair around July 2017, Dkt. 40-1 at 4 (Pl.'s Resp. to Def.'s SUMF ¶ 11), and her August evaluation for the chair.  (Although her request was not approved until September, she started her medical leave at the end of August and thus had no need for the chair during that interval.)  Given these undisputed facts, no reasonable jury could find that WMATA engaged in the interactive process in bad faith.  *See Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 72–73 (D.D.C. 2019) (concluding that a "six-month delay" for computer equipment and software "was reasonable as a matter of law" and did not suggest bad faith); *see also Mayers v. Laborers' Health & Safety Fund of N. America*, 478 F.3d 364, 368 (D.C. Cir. 2007) (per curiam) (suggesting that "a three-year delay in accommodating a plaintiff's disability" would be actionable).

The Court will therefore grant summary judgment in favor of WMATA on the reasonable accommodation claim as it pertains to Reddish's request for an ergonomic chair.

**b.**

In her opposition to WMATA's motion for summary judgment, Reddish raises a second failure-to-accommodate claim, which she at least gestures at in her amended complaint. This claim posits that WMATA failed to engage in the interactive process in good faith because it "disregarded her needs and proceeded with strategizing how to terminate her instead," and, most significantly, failed to make genuine efforts to identify a position to which she could be reassigned following her medical disqualification. Dkt. 39-2 at 15. She asserts that "WMATA never engaged in any meaningful search for her reassignment, while making minimal effort at reassigning her" and "sent [her] contradictory information." *Id.* at 17.

When an employee requests reassignment as a reasonable accommodation for a disability, "the disabled employee must be given more assistance than other job applicants, though employers need not go so far as to place a disabled employee in a position for which [she] is not qualified, or to create a vacant position when none are available." *Butler*, 275 F. Supp. 3d at 85. The record demonstrates that WMATA provided Reddish at least some assistance in seeking reassignment. WMATA first informed her that it would review internal job postings for 60 days, Dkt. 38-13 at 2, and, during that time, a WMATA reassignment officer put forward Reddish as a potential candidate for an Administrative Assistant position, Dkt. 39-4 at 186. Reddish was considered for the position, alongside other ADA-qualified candidates, but she was not ultimately chosen. *Id.* at 214–17. Notably, Reddish does not argue that the reasons for her non-selection, which the record does not elucidate, were pretextual. When that 60-day period concluded, WMATA then informed her that it had been unable to locate an appropriate position—meaning that, for the positions that did become available during that period, Reddish either "did not meet the minimum qualifications," "could not perform the essential functions of

the new position, with or without reasonable accommodation," or "did not have the seniority necessary to receive the position without violating the applicable collective bargaining agreement." Dkt. 38-14 at 2. Reddish, however, remained eligible to seek continued job placement assistance from Ms. Lott through September 2020. *Id.* Reddish does not identify any other position for which she applied, Dkt. 40-1 at 7 (Pl.'s Resp. to Def.'s SUMF ¶ 23), and proffers no evidence that she made further efforts to take up WMATA's invitation to "seek job placement assistance" from the 124/16L Program administrator, Dkt. 38-14 at 2, or otherwise sought to engage in the interactive process herself beyond initially sharing her resume.

Aside from those individual communications and the singular Administrative Assistant position, however, the record is silent as to "whether [other] appropriate vacancies existed [for Reddish] or whether WMATA adequately discharged its duty to help [her] find them." *Butler*, 275 F. Supp. 3d at 86 (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1304 n.27 (D.C. Cir. 1998)). Admittedly, it is surprising that no appropriate position became available during the thirty months that passed from when Reddish was notified of her medical disqualification in February 2018 and when she was terminated in September 2020. But merely surprising is not enough at this stage of the litigation. WMATA has proffered evidence that the ADA Panel made efforts to find her a position for a period of 60 days and that Reddish was informed that she was free to apply—and to seek assistance in applying—for other positions after that. That showing is sufficient to shift the burden to Reddish to proffer *some* evidence to the contrary. Despite ample opportunity to take discovery, however, she offers no evidence suggesting that she was improperly denied the one position identified by the ADA Panel, that the Panel ignored other possible positions, that any other position for which she was qualified (and that she would have wanted to fill) was available, or that WMATA otherwise failed to offer assistance in good faith.

The Court will, accordingly, grant summary judgment in favor of WMATA on the reasonable accommodation claim as it pertains to finding Reddish a replacement position.

**c.**

The Court, finally, notes a potential alternative framing of Reddish's reasonable accommodation claim.  Reddish could perhaps argue that WMATA failed reasonably to accommodate her disability during the reassignment process because it never proposed that she be "transferred" from her Equipment Operator D position to the administrative position that she (at least) *de facto* held prior to her medical leave.  Such an accommodation might well have been the least disruptive way for her employment to have continued, although the record is silent as to who—if anyone—performed Reddish's assigned administrative tasks during her medical leave and whether such a position continued to exist within WMATA.

Although Reddish's amended complaint does allege that she asked "to be transferred back to the office position," Dkt. 16 at 5 (Am. Compl. ¶ 46), she does not develop, support, or even invoke that theory in her opposition to WMATA's motion for summary judgment, which instead focuses on her request for the ergonomic chair and WMATA's failure to offer her adequate assistance in securing a *different* position following her medical disqualification, Dkt. 39-2 at 16–19.  But, in any event, the argument that WMATA did not reasonably accommodate Reddish's disability because it terminated her employment, rather than allowing her to continue working in an administrative capacity, ultimately rests on the same basic premise as Reddish's claim that WMATA violated the Rehabilitation Act by firing her when she remained capable of performing the essential functions of that administrative post.  Because the Court is denying WMATA's motion for summary judgment on that termination claim, however, there is no need separately to consider that same claim through the lens of a reasonable accommodation claim.

Either way, the claim may proceed, and the parties can address how best to frame the question for the jury at a later stage of the proceeding.

*     *     *

The Court will therefore grant summary judgment to WMATA on Reddish's Rehabilitation Act reasonable accommodation claim as it pertains to the request for an ergonomic chair and WMATA's failure to identify a suitable, alternative position to which she might have been reassigned. To the extent Reddish maintains that she should have been allowed to return to her administrative position, however, the Court will deny the motion.

**B.     Title VII**

1.     *Hostile Work Environment*

WMATA next resurfaces its argument from the motion-to-dismiss stage that Reddish's claim for sex discrimination under Title VII is time-barred. Dkt. 38-1 at 8–9. Before a plaintiff may bring a civil action under Title VII, she must timely exhaust administrative remedies for "[e]ach discrete discriminatory act," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), typically by filing a charge with the EEOC within 180 days of the discriminatory act's occurrence, *see* 42 U.S.C. § 2000e-5(e)(1). The earliest possible point at which Reddish complied with that exhaustion requirement was her filing of the EEOC intake questionnaire on February 26, 2021. *See* Dkt. 15 at 10. She therefore cannot bring a claim under Title VII for any "discrete discriminatory act" that occurred more than 180 days before that date: August 30, 2020, when she was still on medical leave.

As the Supreme Court explained in *Morgan*, however, a different rule applies to the administrative exhaustion of claims challenging a hostile work environment. Hostile work environment claims do not challenge discrete acts of discrimination but, rather, "by their nature," they challenge "repeated conduct" involving a "series of separate acts that collectively constitute

18

one unlawful employment practice." *Morgan*, 536 U.S. at 115–17.  As a result, "[i]t does not

matter, for purposes of the statute, that some of the component acts of the hostile work

environment fall outside the statutory time period," so long as "*an* act contributing to the claim

occurs within the filing period."  *Id.* at 117 (emphasis added).

Although Reddish's hostile work environment claim is subject to this more open-ended

standard, her claim still fails because she does not identify a single act that plausibly contributed

to the asserted hostile work environment and that occurred within the 180-day window.  In her

opposition to WMATA's motion for summary judgment, Reddish maintains that the hostile work

environment that she experienced continued even during her period of medical leave.  On

Reddish's telling, the relevant harassment:

> continued, more particularly at this time in the form of her emails being ignored;
> complete and utter failure to accommodate and failure to engage in the
> interactive process in any meaningful way; did not place her back in the office
> (where she was previously, for 3 years) where male employees were afforded to
> work while returning from medical leave; and WMATA interfered with her
> benefits by cutting short her employment status, beginning her entry in the
> reassignment program to be much earlier than when she received the
> determination rather than when she actually received the notice she was
> unqualified; and for the duration of her leave, led her to believe a vacant position
> was being searched for on her behalf when in fact, no search was being
> conducted and ultimately terminated her.

Dkt. 39-2 at 23.  She does not, however, describe a single specific instance of such treatment—

let alone support it with citations to the record—that occurred on or after August 30, 2020, other

than her termination itself, which is discussed in more detail below.  Nor does Reddish link her

termination for medical disqualification, following a report from WMATA's physician that she

was unable to perform the duties of an Equipment Operator D, to any earlier alleged sexual

harassment by her WMATA coworkers.

Even at the motion-to-dismiss stage, conclusory allegations will not suffice.  At the summary judgment stage, that principle applies with even greater force.  At this stage, Reddish cannot avoid summary judgment by merely asserting—without specifics or evidentiary support—that a reasonable jury could find that the series of acts giving rise to a hostile work environment continued during the period when she was no longer present in the workplace.

To be sure, the Court does not doubt that the type of serious abuse necessary to support a hostile work environment claim might—in theory—extend into a period of home leave.  But simply referring, in general, to unanswered emails and to a failure to accommodate under the ADA cannot meet the high standard for treating these (otherwise discrete) acts as part of an ongoing pattern of "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc,* 510 U.S. 17, 21 (1993)).  That is particularly true here, moreover, where the Court has already concluded that WMATA is entitled to summary judgment on Reddish's claims that WMATA failed to accommodate Reddish's request for an ergonomic chair or for assistance finding a new position within WMATA.  Under these circumstances, permitting Reddish to rely on her unspecified and unsupported claims of continuing harassment (such as unanswered emails) to revive the claims of actual harassment that she never timely exhausted would stretch the *Morgan* rule past its breaking point.

The Court will, accordingly, grant summary judgment to WMATA on Reddish's Title VII claim for hostile work environment.

2.     *Termination*

Reddish also asserts a disparate treatment claim under Title VII, alleging that WMATA terminated her from her position even though similarly-situated male employees were provided

reasonable accommodations including, where appropriate, being moved to different jobs.  Dkt. 16 at 5–6 (Am. Compl. ¶¶ 47–50).  Title VII makes it unlawful "for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  "Proof of illicit motive is essential, and the employee at all times has the burden of proving that the defendant intentionally discriminated against her."  *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (citation modified).

Such claims are typically resolved through the familiar *McDonnell Douglas* burden-shifting framework, under which the plaintiff must first make out a *prima facie* case "by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 180–81 (D.D.C. 2016) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005)).  If the plaintiff can establish a *prima facie* case of discrimination, the burden shifts to the employer "'to articulate some legitimate, nondiscriminatory reason' for the adverse employee action."  *Id.* at 181 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Once the employer has done so, and the matter is before the Court for summary judgment, the sole "central question" for the Court is whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . sex."  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Here, WMATA has proffered a legitimate, nondiscriminatory reason for Reddish's termination:  She was medically disqualified from her position as an Equipment Operator D, and

WMATA was unable to find another appropriate position for her.  Dkt. 38-1 at 10.  As discussed above, there is a genuine dispute of fact as to whether Reddish was physically able to perform the essential functions of her position (and, more particularly, whether her position included the administrative duties that she performed for two-and-a-half years) at the time of her termination.  But that does not necessarily defeat WMATA's motion for summary judgment on the Title VII claim, because the question for the purpose of Title VII is not whether the employer's proffered reason turned out to be mistaken.  Rather, for present purposes, the question is whether a reasonable jury could find that the proffered rationale was pretextual *and* that the actual reason that Reddish was terminated was because of her sex.  *See Brady*, 520 F.3d at 494.

In arguing that WMATA's stated reason was a pretext for sex discrimination, Reddish claims to have produced "evidence that similarly-situated males were treated differently and better than she was."  Dkt. 39-2 at 27.  "One way to discredit an employer's justification is to show that similarly situated employees of a different [sex] received more favorable treatment." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (citation modified). Although "[t]he question of whether employees are similarly situated in order to show pretext ordinarily presents a question of fact for the jury," *id.* (citation modified), the plaintiff bears the burden at summary judgment of "demonstrat[ing] that all of the relevant aspects of [her] employment situation were nearly identical to those of the [other] employee[s]," *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (third alteration in original) (citation modified).  "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties [and] whether they [had] the same supervisor." *Id.*

Reddish's complaint identifies nine illustrative male employees who allegedly received more favorable treatment (including not being terminated) after experiencing physical disabilities while working for WMATA.  Dkt. 16 at 5–6 (Am. Compl. ¶ 49).  Those comparisons, however, are not developed in a useful fashion in Reddish's summary judgment briefing.  *See* Dkt. 39-2 at 27–32.  Rather than discuss specific, individual male employees and explain how they were "similarly situated" to Reddish, she instead relies on broad, conclusory statements.  She asserts, for example, that "Plaintiff demonstrates that males were provided with accommodations, new positions, promotions, more favorable tasks, and were treated better than her/female equipment operators, whether in the office or in the field."  *Id.* at 27.  Reddish's assertions are frequently accompanied by long string cites to various affidavits or depositions in the record, with minimal, if any, explanation as to *how* that evidence supports Reddish's position.  Reading her submissions generously, Reddish appears to rely on the following male WMATA employees as comparators:

Nicholas Lamb:  Lamb, a WMATA supervisor, was injured in a motorcycle accident, which forced him to take about three months of medical leave.  Dkt. 39-4 at 62 (Lamb Dep. 41:1–13).  When he went out on leave, WMATA left his maintenance manager position open and postponed an interview that had been scheduled.  *Id.* at 63 (Lamp Dep. 42:3–11).  Reddish has not shown that she was similarly situated to Lamb, who held a different position than Reddish, had a different supervisor, *id.* at 222 (Lamb. Aff.), and suffered from a different injury that required a shorter period of leave, that did not result in a finding of medical disqualification,

and that did not result in an identified equivalent iterative process of discussing reasonable accommodations.[1]

    <u>Gregory Freeman</u>:  Freeman worked as a WMATA equipment operator, rising from Equipment Operator D to Equipment Operator AA.  *Id.* at 95 (Freeman Dep. 25:1–6).  Freeman was severely injured in a motorcycle accident, which ultimately required amputation of his leg below the knee.  Dkt. 41-4 at 8, 10 (Freeman Dep 53:3–6, 75:9–13).  As an initial matter, it bears note that the motorcycle accident occurred in 2011 or 2012, Dkt. 39-4 at 66 (Lamb Dep. 45:20–21), seven or eight years before Reddish was declared medically disqualified.  For that reason alone, the comparison is necessarily an inexact one.  But even more significantly, Freeman was physically able to return to work as an Equipment Operator after taking his medical leave.  Dkt. 41-4 at 10 (Freeman Dep. 75:9–20); Dkt. 39-4 at 222 (Lamb Aff.).  Unlike Reddish, Freeman was not medically disqualified from the Equipment Operator position, and, upon his return, he was able to perform the same duties (including lifting, equipment operation, etc.) that he had before his injury.  Dkt. 41-4 at 8 (Freeman Dep. 53:3–17).

---

[1] At times, Reddish appears to argue that the determination by Dr. Carl Johnson that she was medically disqualified from the Equipment Operator D position constituted a separate instance of gender discrimination.  Dkt. 39-2 at 28.  But even if a finding that she was medically disqualified qualifies as an adverse employment action under Title VII, any challenge to her disqualification would be time-barred.  Reddish, moreover, has failed to proffer any evidence from which a reasonable jury could find that Dr. Johnson (or WMATA more generally) intentionally discriminated against her on the basis of sex in determining that she was medically disqualified.  To the contrary, she does not contest that she was, at least at the time Dr. Johnson rendered his determination, physically unable to perform the duties that WMATA deemed essential functions of the Equipment Operator D position.  Reddish argues that she received disparate treatment because she was disqualified by a WMATA physician, while male employees were cleared to work by their own physicians.  *Id.*  The WMATA communications to Reddish concerning her disqualification, however, did invite her to submit her own documentation that she was able to return to work.  Dkt. 39-4 at 202.  Finally, Reddish's opposition never identifies (with sufficient detail) a specific male employee whom she believes was similarly situated but received favorable treatment in the medical disqualification process itself.

To be sure, approximately two years later, *id.* at 9 (Freeman Dep. 54:6), Freeman was offered a position as a training instructor because his prosthetic device was causing him "severe pain," Dkt. 39-4 at 222 (Lamb Aff.), and he was assigned to an office position for about six months before taking on that role, *id.*  But Freeman testified that, during the two years he worked as an equipment operator after his accident, he never "ask[ed] for any special assistance" and never "need[ed] any changes in [his] job duties," Dkt. 41-4 at 9 (Freeman Dep. 54:7–16), and, like Reddish, Freeman's office assignment was temporary.  Finally, Reddish does not maintain— and she offers no evidence suggesting—that she was passed over for a training position (or any other position) for which she was qualified.

John Lewis Smith, Jr.:  Smith suffered a burn on the job and, following several months' leave, returned to work in an office position "for several months before . . . becom[ing] a supervisor."  Dkt. 39-4 at 220 (Smith Aff.).  As WMATA notes, Dkt. 41 at 9–10, the Smith affidavit is the only evidence supporting Reddish's assertion that Smith is a proper comparator, and neither that affidavit nor Reddish's brief explains what job Smith held at the relevant time, whether he was medically disqualified, whether and how qualifications for a supervisory role corresponded with or differed from Reddish's qualifications, and whether a similar supervisory position (or any other appropriate position) was available at the time Reddish was deemed medically disqualified.  Finally, as with Freeman and Reddish, the office position was only temporary.

Construing the record in the light most favorable to Reddish, as the Court must at this stage, she has nonetheless failed to proffer evidence sufficient to permit a reasonable jury to find that Lamb, Freeman, or Smith was similarly situated to her or that any of the three is an appropriate comparator for purposes of her Title VII discrimination claim.  What is missing in

each case is any indication that the male comparator was, in fact, similarly situated to Reddish and was offered an accommodation that WMATA could have offered to Reddish, but failed to offer her.  It is unsurprising that WMATA has, at times, accommodated its employee's disabilities; whenever possible, it is legally required to do so.  But a plausible inference of sex-based discrimination in declining to accommodate Reddish's disability requires more than cursory evidence regarding a variety of disabilities suffered at different times by individuals with different skillsets, holding different jobs, with different job tenures.

Beyond these comparators, Reddish's opposition brief contains lengthy string citations to depositions and affidavits that purportedly show that she was treated less favorably than "similarly-situated male[]" employees.  *See* Dkt. 39-2 at 27.  Some of these materials, in turn, contain secondhand descriptions of the treatment of male employees with various disabilities. Tellingly, however, Reddish offers no meaningful discussion of any of these materials, and, in fact, many of her citations are either off-point or suffer from the same lack of detail that renders the Lamb, Freeman, and Smith comparisons unhelpful.  To take just one additional example, the Lamb affidavit discusses how, as a supervisor, he accommodated WMATA employee Dave Arnone, who cut several fingers in a non-work injury and subsequently performed administrative duties for approximately one year.  Dkt. 39-4 at 222 (Lamb Aff.).  It is unclear whether Reddish intends to offer Arnone—whose name does not appear in her brief in opposition to WMATA's motion for summary judgment—as a potential comparator and, if so, how Reddish's specific circumstances compare with Arnone's specific circumstances.  The same is true for all of the other male employees whose names are scattered across the 200+ pages of exhibits she cites in her brief, with minimal or no discussion.  And to the degree she does discuss particular comparators, those arguments fail to satisfy her summary judgment burden of "designat[ing]

specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324
(citation modified); *see also Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019)
(an argument mentioned only "in the most skeletal way, leaving the court to do counsel's work"
is forfeited (citation modified)).

Finally, although Reddish does not frame her Title VII argument in precisely these terms,
the Court pauses to consider what might offer a more persuasive (although ultimately
unsuccessful) reason to deny WMATA's motion for summary judgment with respect to this
claim. The record that Reddish has assembled does contain some evidence that she experienced
sex-based prejudice, not in the accommodation process, but in her day-to-day work life as an
Equipment Operator D. Although unsigned and not offered under the penalty of perjury,
Reddish's Exhibit O, for example, details a range of disrespectful and demeaning conduct that
occurred, principally in 2013 and 2014. Dkt. 39-4 at 145–51. As explained above, Reddish
cannot bring a claim regarding those events because she failed timely to exhaust her
administrative remedies. But that does not preclude her from invoking those events as relevant
background or as evidence that her later treatment was attributable to invidious motives.

Ultimately, however, the Court is unpersuaded that this history is sufficient to save her
Title VII/failure-to-accommodate claim for two reasons. First, as noted, the offensive conduct
occurred long before the events that form the basis of her current claim. It was not until 2018, at
the earliest, that WMATA failed to accommodate her disability by failing to find a position for
her to fill after her medical leave. That was four to five years after the offensive conduct that
Reddish invokes. Second, Reddish does not connect that history of allegedly discriminatory
conduct to any of the decisionmakers involved in her Title VII/failure-to-accommodate claim.
She offers no evidence, for example, that Dr. Carl Johnson, who determined that she was

medically disqualified, LaShawn Lott, the Employee Relations Specialist, who contacted her regarding possible accommodations, or Yasmin Mitchell, the ADA Compliance Program Manager, had any connection to that history.  Nor does she identify anyone connected in any way with that history who played any role—direct or indirect—in the events currently at issue. For example, Reddish's (unsworn) assertions in Exhibit O discuss alleged misconduct by WMATA supervisors Gerald Mackall, Joseph Shelton, Joe Curtis, and Tim Hays.  *Id.*  But Reddish fails to offer any evidence suggesting—and she does not appear to argue in her opposition to the motion—that any of those individuals were involved in the work of WMATA's Office of Health and Wellness, the ADA panel, or the Section 124/16L program.  *See* Dkts. 38-11, 38-12, 38-13, 38-14.  As a result, although troubling, the history of allegedly sexist conduct that occurred years earlier has no bearing on Reddish's present claim.

Because Reddish has not identified evidence from which a reasonable jury could find that WMATA's stated reason for terminating her employment (her medical disqualification and the lack of an appropriate position to which she could be reassigned) was pretextual and that WMATA, in truth, acted based on sex-based discriminatory animus, the Court will grant summary judgment to WMATA on Reddish's Title VII claim for disparate treatment.

## C.    Retaliation

Reddish's final claim alleges that she was terminated in retaliation for her request for reasonable accommodations for her disability and for her earlier complaints of sex discrimination by her coworkers, in violation of Title VII.  Dkt. 16 at 9 (Am. Compl. ¶¶ 64–68).  A claim of retaliation under Title VII, like a claim for disparate treatment, is typically evaluated through the *McDonnell Douglas* framework.  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (per curiam).  The plaintiff must first establish a *prima facie* case by showing that "(1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and

(3) a causal connection existed between the two." *Id.* And, as with a disparate treatment claim, once the employer has responded by identifying "legitimate reasons for [the allegedly discriminatory or retaliatory actions] and proffered evidence in support of those reasons," the case proceeds to the "ultimate question of discrimination *vel non*." *Id.* at 156 (citation modified).

WMATA argues that it is entitled to summary judgment on Reddish's retaliation claim based on her complaints of sex discrimination because Reddish concedes that she did not file any sexual discrimination or harassment complaints after 2014, many years before her medical disqualification and subsequent termination. Dkt. 38-1 at 14. The Court agrees. In *Hamilton v. Geithner*, the D.C. Circuit expressed skepticism as to whether a three- or four-month period between the protected activity and the materially adverse action would suffice even to make out a *prima facie* case of retaliation. 666 F.3d 1344, 1357–58 (D.C. Cir. 2012). In this case, more than three *years* elapsed between Reddish's (most recent) 2014 report of sex discrimination, Dkt. 40-1 at 6 (Pl.'s Resp. to Def.'s SUMF ¶ 19), and her 2018 medical disqualification by Dr. Johnson, *id.* at 5 (Pl.'s Resp. to Def.'s SUMF ¶ 15), let alone her 2020 termination. And Reddish's opposition to the motion for summary judgment does not identify any other evidence that would permit a reasonable jury to find that WMATA terminated her in retaliation for her reports of sexual harassment. *See* Dkt. 39-2 at 32–35.

The precise scope of Reddish's alternate theory—that she was terminated in retaliation for her requests for reasonable accommodations for her position—is unclear. Reddish's opposition to WMATA's motion never specifies exactly which protected activity she claims prompted her termination, although she does (unhelpfully) refer generically to "requests for

reasonable accommodations."[2]  Dkt. 39-2 at 33.  To the extent that she claims that WMATA terminated her in retaliation for her request for an ergonomic chair, that contention is wholly unpersuasive and unsupported by the record.  To the contrary, as explained above, the evidence does not even show that WMATA denied that request for a reasonable accommodation, let alone that her request somehow motivated Dr. Johnson's determination that she was medically unqualified.  Indeed, as WMATA notes, there is no evidence in the record that Dr. Johnson was even aware of Reddish's earlier request for an ergonomic chair.  Dkt. 38-1 at 14–15.

    To the extent that Reddish seeks to proceed on a theory that WMATA terminated her on the third anniversary of her medical disqualification in retaliation for her requests for assistance in seeking reassignment, the Court will grant summary judgment to WMATA on that claim as well.  Reddish offers no evidence from which a reasonable jury could find that WMATA terminated her on that date (as WMATA had forewarned) in retaliation for her efforts to seek reassignment to a different WMATA position.  Her briefing is devoid of citations to relevant evidence, and, instead, repackages arguments that WMATA failed to meaningfully pursue potential alternative employment prior to her termination.  Dkt. 39-2 at 34.  Those arguments are relevant to the claim that WMATA did not reasonably accommodate her under the Rehabilitation Act, but they offer no basis for a reasonable jury to infer that her termination (based on a medical disqualification that *predated* her engagement in the interactive process seeking reassignment) was attributable to WMATA's desire to retaliate against her for her engagement in that process.

---

[2] Reddish also appears to suggest that being enrolled in the 124/16L program, which offered her assistance in finding a new position at WMATA, was itself "an adverse action."  Dkt. 39-2 at 33. Her complaint, however, clearly identifies her *termination* as the adverse action anchoring her retaliation claim, rather than any other act by WMATA.  Dkt. 16 at 9 (Am. Compl. ¶ 67).

The Court will therefore grant summary judgment to WMATA on Reddish's retaliation claim.

## CONCLUSION

For the foregoing reasons, WMATA's motion for summary judgment, Dkt. 38, is hereby **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: February 11, 2026